**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | | |
|---|---|---|
| **RONDEL LOVE** | : | **Case No.:** |
| 910 Wake Forest Rd. | : | |
| Riverside, OH 45431, | : | **Judge:** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| v | : | |
| | : | |
| **C. MARTIN COMPANY, INC.** | : | **Jury Demand Endorsed Heron** |
| 3395 W. Cheyenne Ave. #102 | : | |
| North Las Vegas, NV 89032, | : | |
| | : | |
| **Defendant.** | : | |
| | : | |

## <u>COMPLAINT</u>

NOW COMES Plaintiff Rondel Love (hereinafter, "Plaintiff") and proffers this Complaint for damages against Defendant C. Martin Company (hereinafter, "Defendant").

## <u>JURISDICTION AND VENUE</u>

1. This action is brought pursuant to 42 U.S.C. §1981, and O.R.C. Chapter 4112, *et seq.*

2. This Court has subject matter jurisdiction over Plaintiff's 42 U.S.C. § 1981 claims pursuant to Article III of the United States Constitution because they involve a case or controversy arising under a law of the United States.

3. This Court has jurisdiction over Plaintiff's claims under the statutory law of Ohio pursuant to supplemental jurisdiction as codified at 28 U.S.C. § 1367.

4.   Venue is proper in this forum pursuant to 28 U.S.C. §1391, because Plaintiff entered into an employment relationship with Defendant in the Southern District of Ohio and performed his job duties there and Defendant is doing and has done substantial business in the Southern District of Ohio.

## THE PARTIES

5.   Plaintiff Rondel Love is an individual, a United States citizen, and a resident of the state of Ohio.

6.   At all times relevant herein, Plaintiff was an "employee" of Defendant as that term is defined O.R.C. Chapter 4112.

7.   Defendant is a for-profit foreign corporation doing business in the Southern District of Ohio.

8.   At all times relevant herein, Defendant was a covered "employer" as that term is defined under O.R.C. Chapter 4112.

## FACTUAL BACKGROUND

9.   Plaintiff began working for Defendant as a Production Controller on or about April 1, 2018. Plaintiff began working for Defendant when Defendant took over a government contract at Wright-Patterson Air Force Base ("WPAFB") on which Plaintiff previously worked.

10.   A few weeks prior to Defendant taking over the contract, in approximately the middle of March 2018, Plaintiff raised a racial complaint to another employee, Kevin Hicks, regarding another employee on the contract.

11.   Specifically, Plaintiff told Mr. Hicks that an employee, Charles Metzger, had indicated to Plaintiff that he was concerned for Plaintiff's safety if Plaintiff were to work alone with another employee, John Hoelscher, under the new contract.  Plaintiff informed Mr. Hicks

2

that Mr. Metzger communicated this fear for, among other reasons, the fact that Mr. Hoelscher always pulled out a knife in the workplace and started flicking it in the air.

12. Plaintiff told Mr. Hicks that he, too, feared for his safety because in addition to Mr. Hoelscher carrying a knife, Plaintiff informed Mr. Hicks about Mr. Hoelscher previously telling Plaintiff about the fact that he was one of the Caucasian people who turned over the buses of the African-American students after the schools in Dayton, Ohio integrated.

13. Mr. Hicks responded to Plaintiff's complaints and concerns by telling Plaintiff that he was going to be the Project Manager under the new contract, and that he would assign Plaintiff to a different location than Mr. Hoelscher.

14. Towards the end of October 2018, Defendant advised Plaintiff that he would start splitting his time between two different labs. Up until that point, Plaintiff had only worked in the Mixed Labs with his supervisor, Greg Robinson. Defendant wanted Plaintiff to work at Lab 8 as well, with William Caudill.

15. Plaintiff had several meetings with Mr. Caudill, Mr. Robinson, and the Deputy Project Manager, Thomas Johnson, to discuss Plaintiff's transition in responsibilities and job location at WPAFB.

16. One of those meetings took place on or about November 21, 2018. At the beginning of that meeting, Mr. Johnson explained what Plaintiff's schedule was going to be the following month.

17. Upon hearing the proposed schedule, Mr. Caudill raised his concern that the proposed schedule did not appear to allow the flexibility of having Plaintiff work more than a twenty-hour schedule at Lab 8 on a particular week.

3

18.   Mr. Johnson calmly responded by saying, "I don't know, I'll have to get answers as we're going into issues of pay."

19.   Mr. Caudill even proposed a scenario in which there could be a situation in which he needed Plaintiff for twenty-eight hours in his lab in a given week, while Mr. Robinson only needed Mr. Love twelve hours that week.

20.   Mr. Johnson, once again, calmly responded to the proposed scenario by first recognizing issues of labor pooling, but ultimately stating that they could get around the labor pooling issues by getting approval by the necessary parties.

21.   At no point during that part of the meeting, however, did Mr. Johnson become mad or agitated that Mr. Caudill asked questions about deviating from the proposed schedule.

22.   Directly thereafter in the meeting, they began discussing the proposed new requirement that in order for Plaintiff to take leave, he had to first seek approval from Mr. Caudill, Mr. Robinson, and Mr. Johnson.

23.   Plaintiff voiced his concern regarding that requirement, as contacting three separate supervisors on short notice could be very difficult for him at times due to his young children.

24.   As Plaintiff was expressing his concerns and desire to have more input regarding his schedule, Mr. Johnson cut him off and raised his voice stating, "you either accept the proposal or get fired."

25.   Mr. Johnson then proceeded to say to Plaintiff, "you're not equal to me."

26.   Plaintiff became upset about Mr. Johnson's last comment because of the comment's racial connotations.

4

27. Plaintiff also interpreted Mr. Johnson's comment in a racial manner given that Mr. Johnson had previously made racially insensitive comments and actions towards Plaintiff.

28. For instance, a few months prior to the meeting, Mr. Johnson told Plaintiff how much he hated affirmative action and how "some of us would not have jobs without it."  Given that Plaintiff was the only African American in the office, Plaintiff logically interpreted Mr. Johnson's comment as directed at him.

29. On another occasion, Mr. Johnson played a video on his phone in the office during which a number of Caucasian people said the "n" word in the video.  Plaintiff was sitting in the office as Mr. Johnson played the video.

30.  Mr. Johnson also consistently acted as though Plaintiff was inferior, constantly raising his voice at him, cussing at him, and referring to Plaintiff as his "subordinate."  Mr. Johnson did not treat any of the other employees at Defendant that way, even though almost all the other employees reported to Mr. Johnson.

31. In response to Mr. Johnson's comment claiming that Plaintiff was "not equal" to him, Plaintiff stood up and stated that they were equal as they are both men.

32. Likely recognizing the problem with his statement, Mr. Johnson tried to walk back his comment by saying that Plaintiff was not equal to him in terms of his job position.

33. Later that afternoon, Defendant suspended Plaintiff's employment pending an investigation.

34. Approximately five days after Defendant suspended Plaintiff's employment, Defendant terminated Plaintiff's employment.

5

## <u>FIRST CAUSE OF ACTION</u>
## Unlawful Racial Discrimination in Violation of 42 U.S.C. § 1981

35.     As an African American, Plaintiff is a member of a protected class.

36.     Plaintiff was qualified to do his job because, among other reasons, he performed his duties without incident or complaint about his performance.

37.     Plaintiff was subject to an adverse employment action when he was suspended and ultimately terminated by Defendant.

38.     Plaintiff can establish a causal connection between his race and his termination because he was treated less favorably than similarly-situated, non-African-American employees and, upon information and belief, was replaced by a person outside of his protected class

39.     Plaintiff can establish that any stated reason for his termination was a pretext for discrimination because, among other reasons, Defendant's reason for his termination lacks a basis in fact, Defendant's motivation for terminating Plaintiff was insufficient to warrant Plaintiff's termination, and Defendant's stated reason for terminating Plaintiff was not the actual reason that Plaintiff was terminated.

40.     As a result of Defendant's racial discrimination, Plaintiff has been damaged.

## <u>SECOND CAUSE OF ACTION</u>
## Unlawful Racial Discrimination in Violation of O.R.C. 4112 *et seq.*

41.     All of the preceding paragraphs are realleged as if fully rewritten herein.

42.     As an African American, Plaintiff is a member of a protected class.

43. Plaintiff was qualified to do his job because, among other reasons, he performed his duties without incident or complaint about his performance.

44. Plaintiff was subject to an adverse employment action when he was suspended and ultimately terminated by Defendant.

45. Plaintiff can establish a causal connection between his race and his termination because he was treated less favorably than similarly-situated, non-African-American employees and, upon information and belief, he was replaced by persons outside of his protected class.

46. Plaintiff can establish that any stated reason for his termination was a pretext for discrimination because, among other reasons, Defendant's reason for termination lacks a basis in fact, Defendant's motivation for terminating Plaintiff was insufficient to warrant Plaintiff's termination, and Defendant's stated reason for terminating Plaintiff was not the actual reason that Plaintiff was terminated.

47. As a result of Defendant's racial discrimination, Plaintiff has been damaged.

## THIRD CAUSE OF ACTION
### Unlawful Retaliation in Violation of 42 U.S.C. § 1981

48. All of the preceding paragraphs are realleged as if fully rewritten herein.

49. Plaintiff was qualified to do his job because, among other reasons, he performed his duties without incident or complaint about his performance.

50. Plaintiff engaged in protected activity by, among other things, raising a complaint of race discrimination to Mr. Hicks, and opposing Mr. Johnson's racially charged comment that they are "not equal."

51. Plaintiff was subject to an adverse employment action when he was suspended from his position of employment and ultimately terminated by Defendant.

52. Plaintiff's termination is causally connected to his protected activities because, among other reasons, there is a close temporal proximity (i.e., days) between his termination and his most recent protected activity.  Plaintiff also can establish a causal connection given that he was treated less favorably than similarly-situated employees who did not engage in protected conduct.

53. Plaintiff can establish that any stated reason for his termination was a pretext for retaliation because, among other reasons, Defendant's reason for termination lacks a basis in fact, Defendant's motivation for terminating Plaintiff was insufficient to warrant Plaintiff's termination, and Defendant's stated reason for terminating Plaintiff was not the actual reason that Plaintiff was terminated.

54. As a result of Defendant's unlawful retaliation, Plaintiff has been damaged.

## FOURTH CAUSE OF ACTION
### Unlawful Retaliation in Violation of O.R.C. 4112 *et seq.*

55. All of the preceding paragraphs are realleged as if fully rewritten herein.

56. Plaintiff was qualified to do his job because he performed his duties without incident or complaint about his performance.

57. Plaintiff engaged in protected activity by, among other things, raising a complaint of race discrimination to Mr. Hicks, and opposing Mr. Johnson's racially charged comment that they are "not equal."

58. Plaintiff was subject to an adverse employment action when he was suspended from his position of employment and ultimately terminated by Defendant.

59. Plaintiff's termination is causally connected to his protected activities because, among other reasons, there is a close temporal proximity (i.e., days) between his termination and

8

his most recent protected activity.  Plaintiff also can establish a causal connection given that he was treated less favorably than similarly-situated employees who did not engage in protected conduct.

60.   Plaintiff can establish that any stated reason for his termination was a pretext for retaliation because, among other reasons, Defendant's reason for termination lacks a basis in fact, Defendant's motivation for terminating Plaintiff was insufficient to warrant Plaintiff's termination, and Defendant's stated reason for terminating Plaintiff was not the actual reason that Plaintiff was terminated.

61.   As a result of Defendant's unlawful retaliation, Plaintiff has been damaged.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests, monetary damages including economic damages, back pay and benefits, expert witness fees and attorneys' fees and costs, and front pay, compensatory damages and punitive damages in an amount to be determined at trial, which the Court deems just and appropriate.

Respectfully submitted,

/s/  Bradley L. Gibson
Bradley L. Gibson (0085196), Trial Attorney
Brian G. Greivenkamp (0095918)
**GIBSON LAW, LLC**
9200 Montgomery, Rd., Suite 11A
Cincinnati, OH 45242
brad@gibsonemploymentlaw.com
brian@gibsonemploymentlaw.com
513.834.8254 [T]
513.834.8253 [F]

*Counsel for Plaintiff*

## **JURY DEMAND**

Plaintiff demands a jury trial by the maximum persons permitted by law on all issues herein triable to a jury.

/s/  Bradley L. Gibson
Bradley L. Gibson (0085196)

10